**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MOSES MENDOZA,

      *Plaintiff*,

    v.

ANNE ARUNDEL COUNTY,
MARYLAND, *et al.*,

      *Defendants*.

Civil No.: 1:23-cv-01383-JRR

<u>**MEMORANDUM OPINION**</u>

Pending before the court is Defendants Anne Arundel County, Maryland (the "County") and Officers Vanessa Dos Santos and Glenn Johnson's ("Defendant Officers") Motion for Summary Judgment. (ECF No. 36; the "Motion.") The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, the Motion will be granted.

**I.**    <u>**UNDISPUTED FACTS**</u>

Except where noted, the following facts are not in dispute.

**A. The April 25, 2020 Incident**

On April 25, 2020, Plaintiff Moses Mendoza, his wife, Colleen Conaway, his six minor children, and his five-month-old Weimaraner puppy, Zoey, were in the front yard of Plaintiff's property located at 1805 Glenarm Road in Edgewater, Maryland. (Mendoza Dep. Tr., ECF No. 36-2 at 17:21–18:4, 22:8–16; Application for Statement of Charges, ECF No. 36-10.) While the minor children were alone in the front yard, Conaway's stepsister, Sarah Youngquist, walked past the Mendoza home with her two Cane Corso dogs, Dexter ("Dex") and Lexi, both approximately 88 pounds. (Mendoza Dep. Tr., ECF No. 36-2 at 22:8–21; Conaway Dep. Tr., ECF No. 36-5 at

38:11–39:7; Witness Statements, ECF No. 36-9 at p. 3; AAVEC Records, ECF No. 40-7.) Zoey jumped the fence and approached the other dogs, whereupon Plaintiff's testimony, based on what his children recounted to him, is that the dogs became aggressive with Zoey. (Mendoza Dep. Tr., ECF No. 36-2 at 22:13–23:3.) The kids then grabbed Zoey to bring her back into their home. *Id.* at 23:2–4. Conaway testified that she heard Youngquist say, "you better get your fucking dog because my dogs are just going to kill her," (Conaway Dep. Tr., ECF No. 36-5 at 38:20–1.) *See also* L.M. Dep. Tr., ECF No. 40-8 at 9:19–10:1 (testifying that she, Plaintiff's daughter, heard Youngquist say something like "come get your dog before I let my dogs come kill your fucking dogs").

Later that afternoon, Plaintiff, having returned home from an outing, was gardening in his front yard with his wife and children. (Mendoza Dep. Tr., ECF No. 36-1 at 23:9–10.) Zoey had gotten out of the backyard again and was in the front yard. (Conaway Dep. Tr., ECF No. 36-5 at 39:15–20.) Youngquist, near the middle of the street, again walked her dogs past the Mendoza home. (Mendoza Dep. Tr., ECF No. 36-1 at 23:12–13; Conaway Dep. Tr., ECF No. 36-5 at 39:15–20; Apr. 25, 2020 Footage, ECF No. 36-3.) "Zoey had, again, jumped the fence and was trying to" approach Youngquist's dogs, "out of curiosity." (Mendoza Dep. Tr., ECF No. 36-2 at 23:14–17.) Footage of Plaintiff's street provides audio of Plaintiff and his family calling for Zoey to "come" for about six seconds while Youngquist walks past with her dogs. (Apr. 25, 2020 Footage, ECF No. 36-3 at 00:57–1:03.) Plaintiff and his wife contend he was able to get Zoey to come to him. (Mendoza Dep. Tr., ECF No. 36-2 at 23:14–17; Conaway Dep. Tr., ECF No. 40-3 at 39:21–40:1.) Youngquist and a witness both contend Zoey was in the street. (Animal Control Report, ECF No. 40-13 at pp. 4, 6.)

At the same time, Youngquist continued walking past and said, "I'm just going to drop the leash." (Apr. 25, 2020 Footage, ECF No. 36-3 at 1:03–1:04.) Youngquist then appears to stop briefly by the yard, for about three seconds, before her dogs pull her towards Plaintiff's yard where Plaintiff, his family, and Zoey were located. *Id.* at 1:06–1:09. Within about two seconds of the dogs seemingly entering or nearing the yard, there is a loud sound of impact followed by a dog immediately crying out and running back into the street. *Id.* at 1:09–1:12. There are no audible sounds of dogs fighting, barking, or growling before the sound of impact. *Id.* at 1:08–1:11.

According to Plaintiff, Youngquist's dogs "were being highly aggressive, . . . growling, snarling," and "started getting into it with" Zoey. (Mendoza Dep. Tr., ECF No. 36-2 at 24:8–12.) He testified he was afraid about what was going to happen to him, his wife, his children, and his dog. *Id.* at 24:12–15. According to Plaintiff and his wife, he then "banged [a] pole on the ground to try to distract the dogs," *see* Conaway Dep. Tr., ECF No. 36-5 at 40:14–15, and, when that did not work, he "inserted the pole between the dogs" whereupon Dex "came into contact with the pole." *Id.* at 40:15–18.

### B. Investigation of the April 25, 2020 Incident

Youngquist subsequently took Dex to Anne Arundel Veterinary Emergency Clinic ("AAVEC") where she contacted the County Police Department. (Animal Control Report, ECF No. 40-13.) Dos Santos was dispatched for Animal Control to AAVEC for the report of animal cruelty. (Dos Santos Dep. Tr., ECF No. 40-2 at 98:8–11.) By the time she arrived, County Police Department Officers Terenyi, Lewis, and Huckenberg were already present. *Id.* at 101:22–102:1. Upon reviewing the report and learning Youngquist was the complainant, Dos Santos testified, she informed dispatch that she had a "conflict of interest" because she had "once known her." *Id.* at 102:1–6. Dos Santos testified that she was told by dispatch to proceed with the report because

another officer (Johnson) was not available to assist. *Id.* at 102:6–7. Dos Santos did not directly speak with her supervisor, John Canning, regarding the conflict at that time, but testified that Canning monitors all radio calls and so she inferred the communication from dispatch to include Canning's approval. *Id.* at 116:13–22.

Officer Terenyi testified there was a discussion, likely including him, Office Lewis, Animal Control, and Youngquist, that Animal Control would take lead on the investigation "because it . . . involve[d] an animal and possible animal cruelty," but the officers would still take a report. (Terenyi Dep. Tr., ECF No. 40-9 at 14:13–15:2.) Officer Lewis further testified that animal control "was the primary on scene" and that the officers were "just there to assist." (Lewis Dep. Tr., ECF No. 40-11 at 17:3–9.) He did not recall any discussion. *Id.* at 17:10–18. Officer Hulkenberg similarly did not recall any conversation but believed that the matter was for Animal Control and that they were just there for security purposes. (Hulkenberg Dep. Tr., ECF No. 40-12 at 23:5–25:12.) On this point, the police report provides only that Dos Santos said Animal Control "would handle charging the animal cruelty." (AACPD Report, ECF No. 40-10.)

Youngquist provided oral and written statements at AAVEC. She reported that Zoey had approached her in the street while on the return walk, that she could not hold her dogs back because they wanted to play with her, and that Plaintiff grabbed a metal pole and "slammed it down" on Dex's head. (Witness Statements, ECF No. 36-9 at p. 3.) Youngquist admitted that she and Plaintiff yelled at each other during the incident. (Animal Control Report, ECF No. 40-13.) Youngquist also provided the name and phone number of Kevin Robey, who she said approached her after the incident and told her that he had witnessed the attack. *Id.* Youngquist also reported to Dos Santos, after speaking with the vet, that Dex had received three staples to his head laceration, had swelling on the brain, and a concussion. *Id.*; *see also* AAVEC Records, ECF No.

40-7; Dex Photos, ECF No. 36-11. Dos Santos then directed Youngquist to email her pictures of Dex's injury and the AAVEC medical report. (Animal Control Report, ECF No. 40-13.)

After speaking with Youngquist, Dos Santos and Officers Lewis and Huckenberg went to Plaintiff's home. *Id.* Plaintiff similarly provided his oral and written statements, reporting that, during Youngquist's return, Zoey ran to the property line in curiosity but did not interact with Younquist's dogs, that Youngquist purposely let go of the leashes, that her dogs then ran onto his property, and that he used a lawn tool to attempt to separate the dogs. (Animal Control Report, ECF No. 40-13 at p. 5; Mendoza Interview, ECF No. 40-14.) Dos Santos asked about injuries to Zoey, and Mendoza stated that it did not look like she had any. (Animal Control Report, ECF No. 40-13 at pp. 5–6; Mendoza Interview, ECF No. 40-14 at 2:27–2:31.) Dos Santos did look at Zoey to check for injuries and an officer took a picture of Zoey. (Conaway Dep. Tr., ECF No. 40-3 at 136:1–6.) Officer Huckenberg similarly "observed" Zoey and noted "no signs of injury." (Animal Control Report, ECF No. 40-13 at p. 7.) Plaintiff's written statement reiterated that, during her return walk, Youngquist threatened to let her dogs go and that they would kill Zoey, that she released her dogs onto his property, and that they started attacking before he ultimately broke up the fight with the pole. (Witness Statements, ECF No. 36-9 at p. 4.) Mendoza confirmed he had "ample time" to discuss the incident with Dos Santos. (Mendoza Dep. Tr., ECF No. 36-2 at 103:7–9.) He believed his written statement provided to Dos Santos was sufficient to represent his account of what had occurred. *Id.* at 104:16–20.

While at Plaintiff's home, Robey approached Officer Huckenberg and also gave an oral statement and written statement. In his oral statement, he stated that he had observed Zoey leave the yard when Youngquist first walked past and heard her call to the children to get the dog. (Animal Control Report, ECF No. 40-13 at p. 6.) He then stated that, when Youngquist returned,

he saw Youngquist walking on the opposite side of the street from Plaintiff's home, that he could not hear what was said, and that he saw Plaintiff "run back onto his property and pick up a metal object" before swinging it at Youngquist's dogs. *Id.* His statement provided that Plaintiff "came out to get the dog but had something pole like in his hand and swung it at [Younquist's] dogs that were on leashes." (Witness Statements, ECF No. 36-9 at p. 5.)

Dos Santos similarly interviewed Conaway; Conaway provided a written statement. Conaway detailed Youngquist's statement during her walk past the home, including that she yelled to the children that they "better get [their] dog on a fucking leash or I am going to let my dogs kill her." *Id.* at p. 2. Of Youngquist's return from her walk, Conaway wrote that Zoey approached Youngquist and her dogs in the street, that Plaintiff and Conaway called to Zoey to come to them, that Youngquist said "You better get your fucking dog. I can drop this leash and they will just kill her," and that Youngquist's dogs then lunged at Zoey and ran into their yard while Youngquist dropped the leash. *Id.* Conaway said she yelled at Youngquist to get her dogs, but they kept fighting. *Id.* She similarly said that Plaintiff banged the pole on the ground to scare the dogs away and then poked it into the middle of the fight to break up the dogs. *Id.* Conaway felt she was free to write any information she deemed appropriate in her written statement.[1] (Conaway Dep. Tr., ECF No. 36-5 at 52:3–7.)

According to Conaway, she offered for Plaintiff's children to provide written or oral statements, and Plaintiff represents that Dos Santos "refused to speak with any of [his] children." (Conaway Dep. Tr., ECF No. 40-3 at 93:4–14; Pl's Am. Interrogatory Answers, ECF No. 40-5 at

---

[1] Plaintiff asserts that Dos Santos "false identified where Ms. Conaway stated the incident took place, both in her report [and] in an accompanying photograph." (ECF No. 40-1.) Plaintiff provides citations to deposition testimony and the Animal Control Report, but not the photograph. It appears the issue is that Dos Santos marked the wrong location on Plaintiff's property, but Dos Santos's Animal Control Report includes Conaway's statement that Youngquist's dogs went on Plaintiff's property in pursuing Zoey, and that it occurred in their front yard. (ECF No. 40-12 at 7.) That, perhaps, the specific location in the yard was not identified correctly in the picture, which is not provided or cited, is not material to the court's analysis.

6

p. 11.)  Defendants do not appear to dispute this.  Mendoza testified that it was his understanding that any statements from his children would have been consistent with his and Conaway's statements.  (Mendoza Dep. Tr., ECF No. 36-2 at 109:21–110:6.)  Further, Conaway testified that she offered Dos Santos video footage of the incident from their doorbell camera, but Dos Santos responded with something to the effect of "that's not necessary." (Conaway Dep. Tr., ECF No. 40-3 at 136:7–137:8). In contrast, Dos Santos testified that she asked Plaintiff and his wife "if there were cameras," to which Plaintiff said "no" and Conaway did not respond.  (Dos Santos Dep. Tr., ECF No. 36-7 at 112:2–13.)

That evening, Youngquist emailed Dos Santos at her County email with pictures of Dex and the AAVEC records, and Youngquist called Dos Santos on her personal cellphone.  (Apr. 25. 2020 Email, ECF No. 40-16; ECF NO. 40-15.)  Youngquist also texted Dos Santos the following day updating her on Dex's condition and checking on the "process;" Dos Santos responded advising that the case was being reassigned due to the conflict of interest and that she could not discuss the case.  (Apr. 26, 2020 Messages, ECF No. 40-17.)

### C.  Youngquist's Relationship with Dos Santos

Dos Santos started in her position with the County in January 2016.  (Dos Santos Dep. Tr., ECF No. 40-2 at 18:2–4.)  Around March or April 2016, she moved into the basement apartment of Younquist's house at 1810 Glen Arm Road, where she lived until June 2017.  *Id.* at 24:8–19, 26:10–20.  Dos Santos found the apartment from a Craigslist advertisement and worked with the "realtor," who was Youngquist's mother, to complete the paperwork.  Dos Santos testified that she did not keep in touch with Youngquist after she moved out, that they were not connected on social media, that she no longer had her telephone number, and that she had never emailed Youngquist.

*Id.* at 95:5–96:11.  She testified that the text messages on April 26, 2020, were her last communications with Younquist.  *Id.* at 96:12–19.

Dos Santos recalled possibly meeting Youngquist's son.  (Dos Santos Dep. Tr., ECF No. 40-2 at 96:20–22.)  She did not recall if she had ever spoken with Youngquist's stepmother and did not believe she had met Conaway.  *Id.* at 97:1–10.  Conaway testified that she met Dos Santos and spoke about her love of Cane Corsos.  (Conaway Dep. Tr., ECF No. 40-3 at 42:3–21.) Youngquist testified that she met Dos Santos's brother.  (Youngquist Dep. Tr., ECF No. 40-4 at 88:12–13.)  Plaintiff and his wife testified that they observed Dos Santos interact with Youngquist when they lived at the same address (*e.g.*, smoking, talking, grilling the in backyard) and with Dex (*e.g.*, petting Dex, talking to Dex in baby talk).  (Mendoza Dep. Tr., ECF No. 40-6 at 29:6–16; Conaway Dep. Tr., ECF No. 40-3 at 147:2–6.)  Dos Santos testified that she and Youngquist did not have a friendship.  (Dos Santos Dep. Tr., ECF No. 36-7 at 97:14–16.)  Youngquist testified that she would see Dos Santos perhaps weekly and that they did not converse beyond saying "hi." (Youngquist Dep. Tr., ECF No. 40-4 at 88:14–21.  She further testified that Dos Santos would never have been in her backyard.  *Id.* at 87:10–19.

### D.  Application for Statement of Charges

Following the investigation, Dos Santos completed an Animal Control Report that described the steps of the investigation, and contained the initial report and witness accounts. (Animal Control Report, ECF No. 40-13.)  Within a couple of days, the matter was reassigned to Defendant Officer Johnson by Animal Control Supervisor John Canning.  (Johnson Dep. Tr., ECF No. 40-19 at 48:18–49:17.)  Johnson and Dos Santos had worked together throughout Dos Santos's employment, and she was his "designated trainee" for approximately three months early in her employment.  *Id.* at 26:5–21.

8

Prior to reassignment, Dos Santos prepared a draft of an application for statement of charges, dated April 28, 2020.  (Application Draft 1, ECF No. 40-20; Johnson Dep. Tr., ECF No. 40-19 at 51:20, 52:9–14.)  That draft was similar to Dos Santos's Animal Control Report; it detailed her investigation, Younquist's statements, Plaintiff's statements, Robey's statements, and Conaway's statements.  (Application Draft 1, ECF No. 40-20.)  It recommended charges for Abuse or Neglect of Animal, MD. CODE ANN., CRIM. LAW § 10-604(a)(3), and Aggravated Cruelty to Animals, MD. CODE ANN., CRIM. LAW § 10-606(b)(1)(iii).  Another draft of the application was created with a date of April 28, 2020.  (Application Draft 2, ECF No. 40-21.)  It is unknown who drafted this subsequent draft.  (Dos Santos Dep. Tr., ECF No. 40-2 at 194:3–17; Johnson Dep. Tr., ECF No. 40-19 at 61:16–62:1.)

While "[m]ost of the time," the investigating officer submits the resulting application for statement of charges, that did not occur here because "Dos Santos had [done] everything," and the case was then reassigned to Johnson due to the conflict of interest.  (Johnson Dep. Tr., ECF No. 40-19 at 47:13–22.)  Johnson then "took information [he] had" and "drew it up."  *Id.* 47:22–48:7. Johnson acknowledges he did not make credibility determinations, and instead took what was "written down and weigh[ed] it out" to decide what to include and exclude from the Application for Statement of Charges because the investigation information "seemed adequate."  (Johnson Dep. Tr., ECF No. 36-8 at 80:19–81:7, 91:10–13.)

On May 4, 2020, Johnson filed the Application for Statement of Charges (the "Application"), seeking charges of Abuse or Neglect of Animal, MD. CODE ANN., CRIM. LAW § 10-604(a)(3), Aggravated Cruelty to Animals, MD. CODE ANN., CRIM. LAW § 10-606(b)(1)(iii), and Animals at Large, Anne Arundel County Code § 12-4-905.  (Application, ECF No. 36-10.) Johnson is "99% sure" he prepared the Application.  (Johnson Dep. Tr., ECF No. 36-8 at 75:5–8.)

The Application contained language similar to that of the first draft created by Dos Santos, but took out significant detail, leaving only Youngquist's and Robey's accounts, as well as information about Dex's injuries. (Application, ECF No. 36-10.)

A District Court Commissioner subsequently initiated the filing of criminal charges as set forth in the Application. Plaintiff was never arrested or incarcerated. (Mendoza Dep. Tr., ECF No. 36-2 at 112:8–17.) Plaintiff believed an officer with the Sheriff's Office dropped off a summons notifying him that he had been charged with criminal violations related to the April 25, 2020 incident. *Id.* at 114:12–18. Ultimately, the State entered a *nolle prosequi*[2] of the charges, *i.e.*, the State "nol-prossed" the charges. *Id.* at 115:21–116:7. Plaintiff then pled guilty to the Animal at Large citation for the initial instance when Zoey left the property. *Id.* at 117:6–16.

On April 24, 2023, Plaintiff filed the underlying action against Defendants in the Circuit Court for Anne Arundel County, Maryland. (ECF No. 3.) Defendants removed the action to this court on May 24, 2023. (ECF No. 1.) Following motions practice and the filing of Plaintiff's Amended Complaint, the following counts remain:

> Count I: False Light against Defendant Officers;
>
> Count II: Malicious Prosecution against Defendant Officers;
>
> Count III: Civil Conspiracy against Defendant Officers;
>
> Count V: Violation of Article 26 of the Maryland Declaration of Rights—Search and Seizure against all Defendants; and
>
> Count VIII: Violation of 42 U.S.C. § 1983—Malicious Prosecution and Abuse of Power (Fourth Amendment) against Defendant Officers.

(ECF No. 31 ¶¶ 166–232; ECF No. 17.)

---

[2] "A *nolle prosequi* is an official declaration by the State, announcing that it will not pursue the charges in a particular charging document." *In re Darren M.*, 358 Md. 104, 112 (2000).

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive").  Further, "[u]nder this standard, 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Wai Man Tom v. Hospitality Ventures, LLC,* 980 F.2d 1027, 1037 (4th Cir. 2020) (quoting *Anderson,* 477 U.S. at 252).

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see*

11

*also Scott v. Harris*, 550 U.S. 372, 378 (2007).  The court "must not weigh evidence or make credibility determinations."  *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage).  Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

## III.  <u>ANALYSIS</u>

Defendants now seek summary judgment on all of Plaintiff's remaining claims.  Plaintiff opposes the Motion.  The court addresses Defendants' probable cause argument, which underlies three of the remaining claims, before turning to Plaintiff's claims at large.

### A.  Probable Cause

As the court discussed in its previous opinion, "[p]robable cause is 'a probability or substantial chance of criminal activity, not an actual showing of such activity,' and it is assessed based on the totality of the circumstances."  *Nero v. Mosby*, 890 F. 3d 106, 130 (4th Cir. 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 230 (1983)).  Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Gates*, 462 U.S. at 232.  It "is not a high bar."  *Dist. of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citation omitted).

While probable cause "does not require officers to rule out a suspect's innocent explanation for suspicious facts," *Wesby*, 583 U.S. at 61, "an officer may not disregard readily available exculpatory evidence of which he is aware." *Wadkins v. Arnold,* 214 F.3d 535, 541 (4th Cir. 2000). "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable

cause,' the obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (emphasis in original) (quoting *United States v. Halsey*, 257 F. Supp. 1002, 1005 (S.D.N.Y. 1966)).

To succeed in his challenge that his seizure supported by legal process was unconstitutional due to the Application, Plaintiff must prove that Defendant Officers omitted "material facts with the intent to make, or with reckless disregard of whether they thereby made, the affidavit misleading." *Miller v. Prince George's Cnty., MD*, 475 F.3d 621, 627 (4th Cir. 2007) (quoting *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir.1990)). The Fourth Circuit has explained:

> With respect to omissions, "reckless disregard" can be established by evidence that a police officer failed to inform the judicial officer of facts [he] knew would negate probable cause. A plaintiff's allegations of negligence or innocent mistake by a police officer will *not* provide a basis for a constitutional violation.

*Miller*, 475 F.3d at 627 (emphasis in original) (citations omitted); *Jackson v. Carin*, 128 F.4th 525, 534 (4th Cir. 2025) (discussing same).

In its evaluation, the court "only consider[s] the information the officers had at the time" they submitted the Application. *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (quoting *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016)). Of note, "the failure to pursue a potentially exculpatory lead is not sufficient to negate probable cause." *Wadkins*, 214 F.3d at 541 (citing *Smith v. Reddy,* 101 F.3d 351, 357 (4th Cir. 1996)). Further, "[t]he mere fact that the [officer] affiant did not list every conceivable conclusion does not taint the validity of the affidavit." *Colkley*, 899 F.2d at 301 (quoting *United States v. Burnes,* 816 F.2d 1354, 1358 (9th Cir. 1987)); *see also id.* (noting that "the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory," as the latter "potentially opens officers to endless conjecture about

investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit").  Importantly, "an investigating officer must still conduct some sort of investigation and assemble individualized facts that link the suspect to the crime." *Munday*, 848 F.3d at 254.

With regard to materiality, "a plaintiff must demonstrate that the false statement or omission is material, that is, necessary to the [neutral and disinterested magistrate's] finding of probable cause." *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 556 (4th Cir. 2017) (alteration in original) (citations omitted).  "To determine materiality, the Court must excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the corrected warrant affidavit would establish probable cause." *Id.*  (citation modified and omitted).

Accordingly, ultimately, to prevail here, Plaintiff must show: (1) Defendant Officers made misleading omissions in the Application; (2) the omissions "were made deliberately or with reckless disregard for the true"; and (3) the omissions "were material to a demonstration of probable cause," meaning that even with the inclusion of the omitted information, the content would be "insufficient to establish probable cause." *Jackson v. Carin*, 128 F.4th 525, 534 (4th Cir. 2025) (citing *Franks*, 438 U.S. at 155–56).  "[T]he burden of making the necessary showing is . . . a heavy one to bear." *Id.* (quoting *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008)).

Here, the two charges at issue in the Application are as follows:[3]

> Under Criminal Law § 10-604, "a person may not . . . inflict unnecessary suffering or pain on an animal."  MD. CODE ANN., CRIM. LAW § 10-604(a)(3).

> Under Criminal Law § 10-606, "a person may not . . . intentionally . . . cruelly beat an animal."  MD. CODE ANN., CRIM. LAW § 10-606(b)(1)(iii).

---

[3] The court need not consider Animal At Large as Plaintiff pled guilty.

"Cruelty" is defined as "the unnecessary or unjustifiable physical pain or suffering caused or allowed by an act, omission, or neglect." MD. CODE ANN., CRIM. LAW § 10-601(c)(1).

Defendants contend there is no evidence of a material omission that would have precluded the existence of probable cause. (Mendoza Dep. Tr., ECF No. 36-1 at p. 23.) Plaintiff, in turn, identifies three general categories of "omissions" from the Application with which he takes issue—failing to interview, and thus omitting the testimony of, Plaintiff's children; failing to review, and thus omitting, the doorbell camera footage, and failing to include Plaintiff's and Conaway's accounts.

With regard to failure to interview Plaintiff's children, the court is not persuaded this constitutes a material omission. The evidence does not support a reasonable conclusion that Plaintiff's children's testimony, which everyone acknowledges would have been redundant of Plaintiff's and Conaway's, would include facts that would have negated probable cause. *See Miller*, 475 F.3d at 627, *supra*. Dos Santos took testimony from Plaintiff and Conaway who were both present for the incident. The inclusion of the testimony of minor children in the Application would not negate, or establish a lack of, probable cause, especially when considering the additional third-party witness testimony to the contrary. *See id.*

Plaintiff's reliance on *Sevigny v. Dicksey*, 846 F.2d 953 (4th Cir. 1988), is not persuasive for a number of reasons. (ECF No. 40-1 at pp. 12–13.) Most notably, *Sevigny* concerned a warrantless arrest by a police officer, as opposed to the circumstances here—an Application submitted to a District Court Commissioner, *see* 846 F.2d at 956, and the witnesses in *Sevigny* that were not interviewed were (seemingly) uninvolved adult neighbors, not minor children of the defendant. *Id.* Finally, unlike in *Sevigny*, Dos Santos here did interview an uninvolved witness to help clarify the matter; his account validated Youngquist's statement.

With regard to the doorbell camera footage, the court notes the apparent dispute of fact at issue—whether Conaway offered Dos Santos footage of the incident in the first place. (Dos Santos Dep. Tr., ECF No. 36-7 at 112:2–16; Conaway Dep. Tr., ECF No. 40-3 at 136:7–138:12.)  For purposes of the Motion, the court will consider the footage in its analysis of probable cause as a question of law.  The question, then, is whether the contents of footage omitted from the Application were material and omitted with reckless disregard (because Dos Santos knew they would negate probable cause).  Both parties contend the footage supports their respective arguments as to whether probable cause existed as a matter of law.

As discussed above, the footage is minimal and, viewed in a light most favorable to Plaintiff, does not clearly corroborate either account.  The video corroborates that Zoey again approached Youngquist's dogs (though her exact location is unknown).  It corroborates that Youngquist said she would drop the leash.  It corroborates that she did not drop the leash, at least initially, but instead was forcefully pulled by the dogs while holding onto the leash.  It does not demonstrate sounds of a dog fight—no barking, growling, or fighting, or of Plaintiff banging the pole on the ground before inserting the pole when it made contact with Dex.  It demonstrates that Dex was struck in the period of three seconds—between Youngquist being pulled toward the yard and the sound of impact.

The court is not persuaded that inclusion of the content or existence of the footage defeats probable cause.  As discussed above, probable cause is not a high bar and is assessed based on the totality of the circumstances.  Here, considering the facts (the footage) in the light most favorable to the non-movant, no reasonable factfinder could conclude the footage fully corroborates Plaintiff's (or his wife's) account – or for that matter Youngquist's (or the uninvolved witness's) accounts.  Basically, the footage is a zero sum game insofar as its impact on, or competence to

affect the outcome of, Plaintiff's claims and the Motion.  When considering its negligible value, the omission of the footage does not negate probable cause as a matter of law.[4]  *See Wai Man Tom v. Hospitality Ventures, LLC,* 980 F.2d 1027, 1037 (4th Cir. 2020) (noting that on a Rule 56 motion, "'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)), *supra*.

While Dos Santos' failure to review the footage (to the extent she actually was aware of it) may certainly constitute negligence or poor performance, the footage does not provide material facts to invalidate probable cause.  Further, with respect to Johnson in particular, who swore out the Application, there is no evidence before the court that he was aware of any video footage.  *See Munday*, 848 F.3d at 253, *supra*.  As such, there is no evidence that he recklessly disregarded same and omitted it from the Application.  Therefore, while the parties dispute whether Dos Santos was aware of the footage, it does not amount to a material dispute of fact, because its content does not alter the outcome of a material aspect of the claim; which is to say, even considering it in a light most favorable to Plaintiff, its content does not alter the outcome of, or favor, his claim as a matter of law.

Plaintiff's reliance on the Tenth Circuit's decision in *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998), is not persuasive, because the Tenth Circuit subsequently clarified that the portion Plaintiff relies upon is "dictum." *Craft v. White*, 840 F. App'x 372, 375–76 (10th Cir. 2021).  Further, in distinguishing the facts before it from *Baptiste*, the *Craft* court noted that *Baptiste* concerned a warrantless arrest, and the *Baptiste* officer had the video and watched it

---

[4] The court appreciates that Dos Santos testified that she believed the charges should have been dropped after reviewing the video.  (Dos Santos Dep. Tr., ECF No. 40-2 at 112–113.)  Her impression as to prosecutorial discretion, however, does not go to probable cause (its existence or non-existence).

before effectuating the arrest. *Id.* at 376; *cf. Alberty v. Hunter*, 144 F.4th 408, 417 n.2 (2d Cir. 2025) (discussing *Baptiste* and noting that the Second Circuit has "never adopted a rule that officers must watch a video known to them before arresting a suspect"). Both of these facts are similarly distinguishable from the facts here. In any event, the omission was not material for the reasons discussed above.

Finally, the evidence presented offers no support for a reasonable conclusion that Defendant Officers failed to include Plaintiff's and Conaway's statements in the Application "with the intent to make, or with reckless disregard of whether they thereby made," the Application misleading. *See Miller*, 475 F.3d at 627. This does not present a circumstance where Dos Santos failed to "conduct some sort of investigation and assemble individualized facts that link the suspect to the crime." *See Munday*, 848 F.3d at 254, *supra*. For probable cause to be present, Defendant Officers were not required to rule out Plaintiff's defense in support of innocence against the suspicious facts before them, *see Wesby*, 583 U.S. at 61, *supra*. Nor were they required to include same in the Application. *See Colkley*, 899 F.2d at 301, *supra*.

Based on the foregoing, the court concludes that a reasonable factfinder could not conclude that Defendant Officers' omissions (to the extent there are any) were material and made with reckless disregard. That their investigation could have been better in some way or that the Application could have been more thorough is insufficient in view of the lack of materiality of evidence cited as omitted from inclusion. *Cf. Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014) ("To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" (quoting *Brinegar v. United States,* 338 U.S. 160, 176 (1949)).

Against this backdrop, the court turns to Plaintiff's claims.

18

### A. Counts II, V, and VIII: Malicious Prosecution[5]

The court turns first to Plaintiff's common law, state constitutional, and federal claims arising from malicious prosecution. As discussed above, Plaintiff asserts claims of common law malicious prosecution (Count II), search and seizure violations under Article 26 of the Maryland Declaration of Rights (Count V), and malicious prosecution and abuse of power in violation of the Fourth Amendment under 42 U.S.C. § 1983 (Count VIII). Defendants contend they are entitled to judgment as to all.

With regard to Plaintiff's § 1983[6] and state constitutional claims, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. Relatedly, Article 26 of the Maryland Declaration of Rights provides that "all warrants, without oath or affirmation, . . . to seize any person or property, are grievous and oppressive." MD. CONST. DECL. OF RTS. ART. 26. Claims arising under the Fourth Amendment and Article 26 are properly analyzed together because Maryland courts "interpret Article 26 *in pari materia* with the Fourth Amendment, meaning that

---

[5] "When considering a State law claim, the Court must apply the law of the forum state (including as to choice of law), whether proceeding under supplemental or diversity jurisdiction." *Doe v. Cmty. Coll. of Baltimore Cnty.*, 595 F. Supp. 3d 392, 418 n.17 (D. Md. 2022) (citing cases).

[6] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State...subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. Section 1983 creates a private right of action, but not a substantive right; rather, § 1983 creates "a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

the protections under Article 26 are coextensive with those under the Fourth Amendment." *Washington v. State*, 482 Md. 395, 454–55 (2022) (citing cases).

"A 'malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.'" *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). A malicious prosecution claim under the Fourth Amendment "covers unconstitutional seizures supported by legal process." *English v. Clarke*, 90 F.4th 636, 647 (4th Cir. 2024) (citing *Humbert v. Mayor & City Council of Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017)).

"To prove such a claim, a plaintiff must show 'that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.'"[7] *Hupp v. Cook*, 931 F.3d 307, 324 (4th Cir. 2019) (quoting *Evans*, 703 F.3d at 647). As discussed at length above, "[a] party challenging the veracity of a warrant application must show that the officers," relevant here, "omitted from that application, 'material facts with the intent to make, or with reckless disregard of whether they thereby made, the [application] misleading.'" *Hicks v. Anne Arundel Cnty.*, 110 F.4th 653, 661 (4th Cir. 2024) (quoting *Humbert*, 866 F.3d at 556).

Under common law, malicious prosecution "is a tort that allows individuals to recover damages from those 'who had initiated or caused the initiation of criminal proceedings despite having no good reason to believe that criminal charges were justified by the facts and the law.'" *Litchfield v. Rinehart*, No. CV GLR-21-2101, 2022 WL 3716525, at *7 (D. Md. Aug. 29, 2022)

---

[7] "A plaintiff asserting a malicious prosecution claim pursuant to 42 U.S.C. § 1983 need not prove malice." *Middleton v. Koushall*, No. CV ELH-20-3536, 2024 WL 1967816, at *40 n.26 (D. Md. May 3, 2024) (citing *Thurston v. Frye*, 99 F.4th 665, 673 (4th Cir. 2024)).

(quoting *Thompson v. Clark*, 596 U.S. 36, 43 (2022)).  Under Maryland law, malicious prosecution includes four elements: "1) a criminal proceeding instituted or continued by the defendant against the plaintiff;[8] 2) without probable cause; 3) with malice, or with a motive other than to bring the offender to justice; and 4) termination of the proceedings in favor of the plaintiff."[9]  *Heron v. Strader*, 361 Md. 258, 264 (2000).

"Malice is defined as 'conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'"  *Lewis v. Caraballo*, 98 F.4th 521, 537 (4th Cir. 2024) (quoting *Barbre v. Pope*, 402 Md. 157, 182 (2007)).  While "[s]ummary judgment is generally inappropriate when matters such as knowledge, intent, and motive are at issue," *Okwa v. Harper*, 360 Md. 161, 178 (2000), a plaintiff "may not rely on the 'mere existence of such an intent, motive, or state of mind issue to defeat summary judgment.'"  *Hines v. French*, 157 Md. App. 536, 563 (2004) (quoting  *Thacker v. City of Hyattsville*, 135 Md. App. 268, 301 (2000)).

---

[8] The court does not find compelling Defendants' unsupported argument that Plaintiff has failed to show that Dos Santos initiated criminal proceedings against Plaintiff as a matter of law.  As Plaintiff notes, while "a defendant may not be held liable for malicious prosecution for relying upon the independent judgment of a prosecutor or attorney where the defendant has made a full disclosure of all material facts relative to the charges being made," a party who "instigates, aides or assist in a criminal prosecution . . . may be liable even where he/she did not swear out a warrant." *Smithfield Packing Co. v. Evely*, 169 Md. App. 578, 593–94 (2006) (first citing *Brown v. Dart Drug Corp.,* 77 Md. App. 487, 493 (1989); then citing *Wood v. Palmer Ford, Inc.*, 47 Md. App. 692, 701 (1981)).

[9] Because it concludes that Plaintiff fails to establish the second element—lack of probable cause—the court does not reach Defendants' argument that entry of *nolle prosequi* is insufficient to satisfy the element of favorable termination. The court notes, however, that Defendants rely upon *Salley v. Myers*, 971 F.3d 308 (4th Cir. 2020), *abrogated by Thompson v. Clark*, 596 U.S. 36 (2022), for this argument, which (1) concerns an analysis of South Carolina law, and (2) was abrogated on this exact point as to § 1983 claims, with the Supreme Court holding:

> Because the American tort-law consensus as of 1871 did not require a plaintiff in a malicious prosecution suit to show that his prosecution ended with an affirmative indication of innocence, we similarly construe the Fourth Amendment claim under § 1983 for malicious prosecution. Doing so is consistent, moreover, with "the values and purposes" of the Fourth Amendment. *Manuel*, 580 U.S., at 370, 137 S.Ct. 911. The question of whether a criminal defendant was wrongly charged does not logically depend on whether the prosecutor or court explained why the prosecution was dismissed.

*Thompson v. Clark*, 596 U.S. 36, 48 (2022).   Further, in Maryland, "[a] *nol pros* is considered a termination in the plaintiff's favor for purposes of a malicious prosecution claim." *Meyler v. Mayor & City Council of Ocean City*, 736 F. Supp. 3d 272, 295 (D. Md. 2024) (citing *Hines v. French*, 157 Md. App. 536, 554 (2004).  The court does not reach Defendants' arguments regarding Plaintiff's probation before judgment for the citation.

Instead, he "must point to specific evidence" to support a reasonable inference that "the defendant's actions were improperly motivated in order to defeat the motion." *Thacker*, 135 Md. App. at 301. Malice "does not always have to be shown with specificity; it can be inferred." *Id.* at 307 (quoting *Leese v. Baltimore Cnty.*, 64 Md. App. 442, 480 (1985), *disapproved of on other grounds by Harford Cnty. v. Town of Bel Air*, 348 Md. 363 (1998)); *see Lewis v. Caraballo*, 98 F.4th 521, 537 (4th Cir. 2024) (same). Further, and of import here, it "may be inferred from the lack of probable cause." *DiPino v. Davis*, 354 Md. 18, 55 (1999); *Middleton v. Koushall*, No. CV ELH-20-3536, 2024 WL 1967816, at *42 (D. Md. May 3, 2024) (discussing same).

Each of the aforementioned claims requires Plaintiff to prove that he was seized pursuant to a legal process that was not supported by probable cause. In view of the court's probable cause analysis, above, Defendants are entitled to summary judgment on each claim.[10]

Further, with respect to Plaintiff's common law malicious prosecution claim, Plaintiff also fails to point to sufficient evidence to support a reasonable inference of malice as to either Defendant Officer. *See Thacker*, 135 Md. App. at 301, *supra*. As Plaintiff's claim of malice does not (cannot) rest on a lack of probable cause, his proffer of evidence of malice is simply not sufficient. Plaintiff contends the following supports a showing of malice or ill will by Dos Santos:

> As to Officer Dos Santos, the evidence shows that she took "lead" of the investigation despite having a clear conflict of interest that she recognized herself at the time. Nonetheless, she failed to recuse herself or talk to her supervisor about whether recusal was appropriate before taking charge of the investigation. Office Dos Santos not only concealed her conflict from the responding police officers, but went so far as to assert the authority of Animal Control and herself in the investigation over the police. She then used that position to manipulate the investigation, refuse readily available evidence, and falsify Ms. Conaway's statement about the incident location to cast doubt on her and Mr. Mendoza's credibility.

---

[10] Because the court concludes that Plaintiff cannot prevail on his claim of lack of probable cause, the court does not reach Defendants' argument as to qualified immunity. (ECF No. 36-1 at pp. 16–18.)

(ECF No. 40-1 at pp. 22–23.)

There is no dispute that Plaintiff identified a potential conflict of interest and reported same to the dispatcher upon identifying it. (Dos Santos Dep. Tr., ECF No. 36-7 at 117:2–22.) Dos Santos was then directed to proceed. *Id.* To the extent Plaintiff seeks to contradict or oppose this, he offers no evidence beyond mere speculation. The evidence before this court about Dos Santos's "relationship" with Youngquist is minimal and, in any event, unavailing; Plaintiff paints it as a close relationship, but no evidence in the record supports a reasonable conclusion that was the case – by inference or otherwise. The only evidence is that Dos Santos and Youngquist had occasional conversations in, at most, a courteous landlord-tenant relationship. Dos Santos's role in the investigation is similarly not persuasive where the evidence pretty uniformly provides that the decision was made between Animal Control and the County Police Department, that Animal Control "most likely would [take the lead on the investigation] because it did involve an animal and possible animal cruelty." (Terenyi Dep. Tr., ECF No. 40-9 at 14:13–20.) Further, while the court appreciates, as Plaintiff suggests, the investigation process could have been overall better or cleaner, Dos Santos did not fail to conduct an investigation. She went to the scene. She took witness statements from four individuals. She reviewed Dex's medical records. She took photographs. She was cordial with all parties involved.

Plaintiff's reliance on sparse evidence and speculation is insufficient to defeat summary judgment. Based on the evidence presented to the court, no reasonable factfinder could find Dos Santos bore ill will or acted with intent to injure.

Finally, with respect to Johnson, a reasonable factfinder could similarly not reasonably infer that Johnson acted with malice in swearing out the Application. The evidence before the court is that Johnson reviewed the information collected by Dos Santos in the investigation and

23

filed the Application.  (Johnson Dep. Tr., ECF No. 36-8 at 48:3–7, 51:17–52:4.)  The record evidence does not hint at or suggest ill will or intent to injure where, at the direction of a supervisor, Johnson relied upon another investigator officer's report after a case was reassigned due to conflict. Moreover, with regard to the doorbell camera footage, as discussed above, there is no evidence that Johnson was even aware of it.  Again, the court appreciates that Plaintiff believes Johnson could have tightened up the investigation with better follow-up, but his failure to do so here does not support a reasonable inference of malice.

In all, Plaintiff fails to generate a triable issue as to malice of either Defendant Officer. Defendants have met their burden to show they are entitled to judgment as a matter of law as to Counts II, V, and VIII.

### B.  Count I: False Light

The tort of false light "involves highly objectionable publicity, where the publicity is false or misleading, and may be alleged even if the information publicized is not a secret."  *Kaur v. Pollack*, No. CV SAG-21-00292, 2021 WL 1890630, at *6 (D. Md. May 10, 2021) (citing *Hollander v. Lubow*, 277 Md. 47, 57 (1976), *superseded on other grounds by* MD. RULE 2-501(a), (e)).  The tort of false light occurs when an actor gives "publicity to a matter concerning another that places the other before the public in a false light," where "(a) the false light in which the other person was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  *Lindenmuth v. McCreer*, 233 Md. App. 343, 367 (2017) (quoting *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 513–14 (1995)).  To constitute the tort of false light, the public disclosure must be public and false.  *Id.* (first citing *Furman v. Sheppard*, 130 Md. App. 67, 77 (2000); then citing *Bagwell*, 106 Md. App. at 514).

Importantly, "[t]here are circumstances in which a person will not be held liable for a defamatory statement because the person is acting 'in furtherance of some interest of social importance, which is entitled protection.'" *Gohari v. Darvish*, 363 Md. 42, 55 (2001) (quoting *Woodruff v. Trepel,* 125 Md. App. 381, 391 (1999)).  A defendant in a false light claim "may interpose the defense of a qualified, or conditional, privilege, and thus would not face liability," where he, "in good faith," has given publicity to a matter concerning another "in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties, or where his declaration would be of interest to the public in general." *Carter v. Aramark Sports & Ent. Servs., Inc.*, 153 Md. App. 210, 241–42 (2003) (quoting *Gohari,* 363 Md. at 56); *see Lindenmuth*, 233 Md. App. at 367 (discussing the four types of qualified privilege and recognizing same in the context of a false light claim).  A defendant is entitled to judgment as a matter of law where the publicized matter "is protected by a qualified privilege." *Bagwell*, 106 Md. App. at 514.

There is no dispute that Defendant Officers may assert a qualified privilege defense based on submission of the Application; and the court agrees.[11]  (ECF No. 40-1 at p. 19.)  *Cf. Smith v. Danielczyk*, 400 Md. 98, 126 (2007) ("[W]e are convinced . . . that defamatory statements made in an application for search warrant should be protected by a qualified, not an absolute, privilege"); *Johnson v. PNC Bank, N.A.*, No. CV ELH-19-3136, 2020 WL 1491355, at *10 (D. Md. Mar. 27, 2020) (discussing the *Smith* holding).

That notwithstanding, a defendant "may forfeit his or her privilege by abuse," including where "the publication is made with malice, that is, with 'knowledge of falsity or reckless disregard for truth . . . .'" *Lindenmuth*, 233 Md. App. at 359 (quoting *Carter*, 153 Md. App. at 242).  In such

---

[11] It appears to this court that Dos Santos did not swear out the Application, which is the basis for the publication, and so this element would not be met as to her.  Defendants, however, do not argue this point.  The court therefore confines its analysis to the arguments actually advanced by the parties.

circumstances, a plaintiff must prove "actual malice or "constitutional malice." *See id.* at 360 (citation omitted). Actual malice cannot be shown merely by evidence that "the publication was erroneous, derogatory[,] or untrue," or that "the publisher acted out of ill will, hatred or a desire to injure." *Bagwell*, 106 Md. App. at 512–13. Instead, the evidence must support a defendant's "actual knowledge" that the publication was false, together with an "intent to deceive another by means of that statement." *Lindenmuth*, 233 Md. App. at 360 (quoting *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 240 (1995)). The question of whether a qualified privilege "has been forfeited by malice is usually a question for the jury." *Gohari*, 363 Md. at 63 (quoting *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 600 (1976)); *see Lindenmuth*, 233 Md. App. at 360–61 (recognizing same).

Even assuming without deciding that the Application constitutes publicity and that the content therein is in fact false, for the reasons discussed above, there is insufficient evidence upon which a reasonable factfinder could conclude that either Defendant Officer acted with malice with respect to the Application (or at all). Plaintiff's reliance on speculation and inference is insufficient to generate a triable issue. Accordingly, the court will grant the Motion as to Count I.

### C. Count III: Civil Conspiracy

Because the court will enter judgment for Defendants on the predicate torts upon which Plaintiff's civil conspiracy claim is based, they are entitled to summary judgment as to Count III. Even were that not the case, Plaintiff's civil conspiracy claim would fail.

"Under Maryland law, civil conspiracy is defined as the 'combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff.'" *Marshall v. James B. Nutter & Co.*, 758 F.3d

537, 541 (4th Cir. 2014) (quoting *Hoffman v. Stamper,* 385 Md. 1, 24 (2005)).  Civil conspiracy is composed of three elements: "1) A confederation of two or more persons by agreement or understanding; 2) [S]ome unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and 3) Actual legal damage resulting to the plaintiff."  *Windesheim v. Larocca*, 443 Md. 312, 347 (2015) (quoting *Lloyd v. Gen. Motors Corp.,* 397 Md. 108, 154 (2007)).  "An unlawful act connotes a tort, breach of contract or other actionable wrong."  *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 696 (D. Md. 2012).

"Conspirators do not voluntarily proclaim their purposes; their methods are clandestine." *Hoffman v. Stamper,* 385 Md. 1, 25 (2005) (quoting *W. Md. Dairy v. Chenowith*, 180 Md. 236, 243 (1942)).  As such, "[c]ivil conspiracy may be proved by circumstantial evidence because 'in most cases it would be practically impossible to prove a conspiracy by means of direct evidence alone.'"  *Windesheim*, 443 Md. at 347–48 (quoting *Hoffman,* 385 Md. at 25).

> [A] conspiracy may be established by inference from the nature of the acts complained of, the individual and collective interest of the alleged conspirators, the situation and relation of the parties at the time of the commission of the acts, the motives which produced them, and all the surrounding circumstances preceding and attending the culmination of the common design."

*Hoffman,* 385 Md. at 25–26 (quoting *Western Md. Dairy,* 180 Md. at 243–44).

Establishing conspiracy by inference, however, is not without limit.  To survive summary judgment, a plaintiff must produce evidence to prove an agreement between the alleged conspirators to engage in the unlawful or tortious  act.  *Elecs. Store, Inc. v. Cellco P'ship*, 127 Md. App. 385, 411 (1999); *Lawley v. Northam*, No. CIV.A. ELH-10-1074, 2011 WL 6013279, at *23 (D. Md. Dec. 1, 2011).

Here, Defendants contend Plaintiff presents no evidence of a conspiracy, specifically that Defendant Officers worked in concert with one another.  Plaintiff urges, however, that the facts allow for factfinder deduction of a conspiratorial agreement—specifically, "the long-working relationship of Defendant Officers, Johnson's departure from his typical practices, the suspect and unexplained nature of multiple application drafts, and Defendant Officers' collaboration while those applications were prepared."  (ECF No. 40-1 at p. 26.)  The court is unpersuaded.

The court agrees with Defendants that Plaintiff fails to offer evidence necessary to establish a conspiracy, including by inference.  Although Plaintiff relies on undisputed record facts to argue that a factfinder could reasonably find the requisite agreement, the record – even viewed generously in favor of Plaintiff – does not raise a reasonable inference of agreement between Defendant Officers to engage in a tortious act (or a lawful act by tortious means).  That one coworker took over for another coworker, in the course of their employment, at the direction of a supervisor, fails to support such any such conclusion.  The "quantum and quality" of the circumstantial evidence in *Hoffman* is entirely lacking here.  *Hoffman v. Stamper,* 385 Md. 1, 28 (2005).  Plaintiff "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citing *Barwick v. Celotex Corporation,* 736 F.2d 946, 963 (4th Cir. 1984)).

In addition to the lack of necessary predicate offenses, Plaintiff fails to generate a triable issue to take his civil conspiracy claim to trial.  The court will grant the Motion as to Count III. [12]

---

[12] Defendants have not argued application of the intracorporate conspiracy doctrine as a basis for judgment on Count III.  *See Baltimore-Washington Tel. Co. v. Hot Leads Co., LLC*, 584 F. Supp. 2d 736, 744 (D. Md. 2008).  The court constrains its analysis to the arguments asserted.

IV.    **<u>CONCLUSION</u>**

For the reasons set forth herein, by separate order, the Motion will be granted.

September 18, 2025                                                    /S/

_____
Julie R. Rubin
United States District Judge